IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NANCY ROBERTSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| WILLIAMS-SONOMA, INC. | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S COMPLAINT

Nancy Robertson complains of Williams-Sonoma showing as follows:

## SUMMARY

1.      Robertson was fired by Williams-Sonoma because of her age, 63 years old.  There is overwhelming direct and circumstantial evidence to prove it.

2.      In August 2001, Robertson began working for Pottery Barn, a Williams-Sonoma brand.  In approximately May 2006, Robertson was promoted to be the Assistant Store Manager of the Town and Country Pottery Barn store in Houston, Texas.

3.      Robertson's direct managers, subordinates, and regular customers all thought highly of her work ethic, leadership skills, product knowledge, customer service, and overall performance as the Assistant Store Manager (Fagin Aff., Ex. A at ¶¶ 8, 11, 12; Baldwin Aff., Ex. B at ¶ 17; Brader Aff., Ex. E at ¶¶ 7-8; Kochanski Aff., Ex. F at ¶¶ 4, 7; Loya Aff., Ex. G at ¶¶ 7, 11; Jones Aff., Ex.  H at ¶ 5; Taflinger Aff., Ex. J at ¶¶ 3-8; Lomonte Aff., Ex. K at ¶¶ 2-14; Robinson Aff., Ex. M at ¶¶ 2-5).  Robertson and her team produced objectively great results:  the Town and Country Pottery Barn store consistently financially flourished during her tenure as Assistant Store Manager.

4.      In 2010, the Town and Country Pottery Barn store was having its best year ever (Baldwin Aff., Ex. B at ¶ 16).  It was one of the top performing Pottery Barn stores in the entire country.  Despite that, late that year, a new District Manager named Natalie Spangler told the Town and Country Pottery Barn store's General Manager, Brian Baldwin, that Robertson was "old," that "she wasn't going to change," and that "we needed to get rid of her."   (Baldwin Aff., Ex. B at ¶ 8).   Spangler told Baldwin that she wanted him to "create a paper trail" so as to make it falsely appear as though Robertson's termination was justified on paper (*Id*.).   When Baldwin did not act fast enough for her, Spangler pushed him aside, created the paper trail herself, and promptly fired Robertson at the predetermined end of that trail, on April 12, 2011.  So ended Robertson's nearly ten-year career with the Company at age 63.

5.      After her termination, Robertson sought unemployment benefits with the Texas Workforce Commission ("TWC").  The TWC's appellate tribunal found that, "[t]he evidence presented by the claimant showed that the claimant was terminated based on her age and not on her performance." (TWC Finding, Ex. I at 4) (underline added).

6.      A literal mountain of direct and circumstantial evidence proves that Williams-Sonoma fired Robertson because of her age (Exs. A-C, E-M).  Then, when called to account for it, Williams-Sonoma compounded its wrongdoing by falsely accusing Robertson of chronically mistreating the very persons she had tirelessly devoted herself to serving for years: her subordinates and customers (Letter from Kobata to Oberti of 06/07/11, Ex. D).  Summing its untenable position in a letter to Robertson's lawyer, Williams-Sonoma boldly proclaimed that Robertson's "impertinent and inappropriate behavior toward her managers, subordinates and customers created an intolerable situation ultimately leading to her discharge," and, for good measure, added that "it appears that the only individual who did not view Ms. Robertson's

leadership style as inappropriate was your client."  (Letter from Kobata to Oberti of 06/07/11, Ex. D at 1-2).

7.     Williams-Sonoma should have known that trying to demonize Robertson as a tyrannical and hated manager would never work.  It has already failed:  Robertson's former managers, subordinates, and regular customers have given substantial sworn testimony refuting Williams-Sonoma's pretextual attacks on Robertson (Fagin Aff., Ex. A at ¶¶ 8, 11, 12; Baldwin Aff., Ex. B at ¶ 17; Brader Aff., Ex. E at ¶¶ 7-8; Kochanski Aff., Ex. F at ¶¶ 4, 7; Loya Aff., Ex. G at ¶¶ 7, 11; Jones Aff., Ex.  H at ¶ 5; Taflinger Aff., Ex. J at ¶¶ 3-8; Lomonte Aff., Ex. K at ¶¶ 2-14; Robinson Aff., Ex. M at ¶¶ 2-5).   These people worked with Robertson day in and day out for a combined 20+ years.  They know the real truth about Robertson, and have sworn to it.

8.     **Former Managers' Affidavits**.  Robertson's two direct managers from January 2007 through mid-February 2011, Brian Fagin and Brian Baldwin, testified that Robertson was "dedicated and devoted," "treated customers with respect and courtesy," "treated store associates with respect and courtesy," "worked hard," "learned things quickly," "had integrity," and "truly cared about the store and the customers."  (Fagin Aff., Ex. A at ¶¶ 8, 11, 12; Baldwin Aff., Ex. B at ¶ 17).

9.     Fagin was Robertson's manager for almost three years (Fagin Aff., Ex. A at ¶ 3). Fagin testified that Robertson was "the best Assistant Manager I ever had." (Fagin Aff., Ex. A at ¶ 8).  Fagin rated Robertson an "8" or "9" out of a "10" point performance scale (*Id*.).  Fagin thought so highly of Robertson that when he resigned from Pottery Barn he recommended that she replace him as the General Manager of the Town and Country store (*Id*. at ¶ 9).  Contrary to Williams-Sonoma's claim (Letter from Kobata to Oberti of 06/07/11, Ex. D at 2), Fagin testified that he did not view Robertson's leadership style to be inappropriate, and he was never told by

anyone else that they viewed it as inappropriate either (Fagin Aff., Ex. A at ¶ 13).   Fagin and

Baldwin's affidavits completely reject Williams-Sonoma's fabricated claim that Robertson

treated her managers, subordinates, and customers in an "impertinent and inappropriate" fashion

(Letter from Kobata to Oberti of 06/07/11, Ex. D at 1).

10.     **Former Subordinates' Affidavits**.   Five of Robertson's former subordinates,

who worked with Robertson a combined total of approximately fifteen years, have averred that

they found Robertson's leadership style to be "fair," "appropriate," and "inspirational," that

Robertson "was beloved by many of the employees because she led by example and showed

such care and compassion," that Robertson "would bend over backwards to please a customer,"

that Robertson's "style of leadership was like a good mentor," that Robertson "made things fun

and motivated the employees," that Robertson "brought stability and calm to the store," that

Robertson "was very devoted and worked extremely long hours," that Robertson "basically knew

the store and the products inside and out," that "unlike other managers at Pottery Barn, she was

very hands on with customers with the regular clients knowing her name," that "she made going

to work much easier and Pottery Barn a positive place," that "she worked extremely long hours,

but always had a smile" and that she was "a remarkable person for a lot of reasons" (Brader Aff.,

Ex. E at ¶ 7-8; Kochanski Aff., Ex. F at ¶¶ 4, 7; Loya Aff., Ex. G at ¶¶  7, 11, 13; Jones Aff., Ex.

H at ¶ 5; Taflinger Aff., Ex. J at ¶¶ 4, 5, 7).

11.     One subordinate, who had worked for Robertson for more than six years, averred

that she was so saddened by Robertson's unjust termination that, when she learned about it, she

cried (Loya Aff., Ex. G at ¶  9).

12.     **Former Regular Customers' Affidavits**.   Two of Robertson's former regular

customers, who each shopped with her for many years, have averred that they found Robertson

-4-

"very helpful, fun to work with," "informative," "very attentive, kind, and friendly," "high energy," that they "could feel the excitement and positivity in the store when she was there," that her "customer service was incredible . . .  a 10 out of 10 – the very best possible," that they "could tell that the workers functioned as a strong team and that [Robertson's] leadership was both inspirational and motivational," that Robertson "was always professional," that Robertson was "helpful, friendly and extremely knowledgeable about the product," that Robertson was "a great leader who was very respected by the other workers in the store" and that Robertson was a "true star"  (Lomonte Aff., Ex. K at ¶¶ 3-4, 6-8, 11; Robinson Aff., Ex. M at ¶¶ 2-3).  One of Robertson's former regular customers has even boycotted Pottery Barn because of its treatment of Robertson (Lomonte Aff., Ex. K at ¶ 14), and another "was so upset that [she] considered writing a letter to the Pottery Barn Corporate office to complain." (Robertson Aff., Ex. M at ¶ 4).

13.     The nine affidavits from Robertson's former managers', subordinates', and regular customers' substantially explain why the Town and Country Pottery Barn store was one of the top performing Pottery Barn stores in the entire country in 2009 and 2010 – the relentless hard work, single-minded devotion, and inspirational leadership of Robertson.  If, as Williams-Sonoma contends now, Robertson was a walking disaster who was despised by all of her key constituencies, then: (a) the Town and Country Pottery Barn store would not have been one of the top performing stores in the country; and (b) so many of Robertson's former managers, subordinates, and regular customers would not have testified as they have.  The transparent truth is that Williams-Sonoma fired Robertson because of her age, 63 years old, just as Spangler ordered (Baldwin Aff., Ex. B at ¶ 8).

14.     Robertson dedicated her life to Williams-Sonoma.  She never wanted to sue the Company.  She is loath to do it now.

15.     But, because Williams-Sonoma regrettably refuses to take responsibility for its illegal age discrimination against her, Robertson has been forced to file this lawsuit against the Company under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and Chapter 21 of the Texas Labor Code.

<u>**THE PARTIES AND JURISDICTION**</u>

16.     The Plaintiff, Robertson, is a natural person residing in Katy, Texas.  Robertson has standing to file this lawsuit.  She was employed by Williams-Sonoma most recently located at Pottery Barn # 385, Town and Country Village, Space #1200 Bldg #12, 12850 Memorial Drive, Houston, TX 77024.

17.     Williams-Sonoma, Inc. is a consumer retail company that sells kitchenwares, furniture and linens, as well as other housewares and home furnishings, along with a variety of specialty foods, soaps and lotions.  Its international corporate headquarters is in San Francisco, California.  The company operates over 500 retail stores in the United States and Canada under a portfolio of brands, including approximately 250 Williams-Sonoma stores, 200 Pottery Barn stores, and more than 80 Pottery Barn Kids stores.  Other subsidiary brands include Williams-Sonoma Home, West Elm, and PBteen. The company has billions of dollars in revenues each year, and employs more than 7,000 full-time employees.   In 2011, Williams-Sonoma, Inc. reported that net revenues for the 2010 fiscal year increased 12.9% to $3.5 billion versus $3.1 billion in fiscal year 2009.

18.     Williams-Sonoma, Inc. is headquartered at 3250 Van Ness Avenue, San Francisco, California 94109-1012.  Williams-Sonoma, Inc. may be served with process through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

19.     The Court has personal jurisdiction over Williams-Sonoma, Inc. based on both general and specific jurisdiction.

20.     The Court has subject matter jurisdiction over this case based on both federal question jurisdiction and diversity jurisdiction.

21.     There is federal question jurisdiction because Robertson bases one of her claims on a federal law, the ADEA.

22.     There is diversity jurisdiction because Robertson is a Texas resident, Williams-Sonoma, Inc. is a citizen of Delaware, incorporated under Delaware law, that maintains its principal place of business in California, and the matter in controversy exceeds $75,000.00, excluding interest and costs.

23.     The Court has supplemental jurisdiction over Robertson's age discrimination claim under Chapter 21 of the Texas Labor Code.

## FACTUAL BACKGROUND

**A.    ROBERTSON DID SUCH A GOOD JOB AS ASSISTANT MANAGER OF THE POTTERY BARN STORE THAT, WHEN THE GENERAL MANAGER OF THE STORE RESIGNED IN OCTOBER 2009, HE RECOMMENDED THAT THE COMPANY PROMOTE ROBERTSON TO REPLACE HIM**

24.     Robertson began working at Williams-Sonoma's Pottery Barn brand in August 2001.  She was extremely dedicated to Pottery Barn and to her store.  Her intensity and burning desire to excel were relentless.  During her entire employment tenure Robertson never called in "sick" a single day.  In sickness and in health, Robertson showed up to work every day with her trademark great attitude and singular focus on making the Town and Country Pottery Barn store the best it could be.

25.     Robertson was at the store so frequently, for so many years, that her name became synonymous with the store.  As one former employee testified, "[w]hen you thought of Pottery

Barn at Town and Country Mall, you thought of Nancy Robertson." (Jones Aff., Ex. H at ¶ 11). As another former employee testified about Robertson, working at Pottery Barn was "a passion to her, not just a job." (Loya Aff., Ex. G at ¶ 13).

26.     Over the next approximately five years, Robertson performed well, and proved that she was a loyal, dedicated, and diligent employee, and management material. As a result, in approximately May 2006, she was promoted to the position of Assistant Manager of the Town and Country location. Robertson was the only Assistant Manager of that store.

27.     As the Assistant Manager, Robertson reported to the store General Manager. The General Manager from January 2007 until approximately October 2009, was Brian Fagin (Fagin Aff., Ex. A at ¶ 3). During the nearly three years that Fagin was Robertson's manager, he regarded Robertson as a quick learner, who was honest, dedicated, and devoted to Pottery Barn (*Id*. at ¶ 8). Fagin perceived that Robertson "treated customers and coworkers with respect and courtesy." (*Id*.). Fagin also believed that "[t]he store associates generally seemed to like and respect [Robertson]." (*Id*.). Fagin trusted Robertson to effectively run the store in his absence (*Id*.).

28.     In May 2009, Fagin gave Robertson her 2008 Performance Evaluation. Fagin rated Robertson "Exceeds Expectations" in the categories of "Inspires and Leads," "Achieves Results," and "Fosters Open Communication," and an overall score of 3.34, which was between "Meets Expectations" (a "3") and "Exceeds Expectations" (a "4").

29.     In fiscal year 2009 the Town and Country Pottery Barn store was ranked by Williams-Sonoma as one of the top performing Pottery Barn stores in the United States of America.

30.     Bonuses the Company paid to Robertson in 2009 further prove the point that the Town and Country Store had flourished in 2009, and exceeded Williams-Sonoma's own expectations, even while the overall economic conditions in America, and especially related to retailers, was so bad that the Company had suspended all raises for employees in 2008, and for all Fair Labor Standards Act ("FLSA") exempt employees in 2009.

31.     During the entire time that Robertson was an Assistant Store Manager, she was eligible to receive monthly store manager bonuses.  The monthly store manager bonuses are only for FLSA-exempt store managers.  The only FLSA-exempt managers in the Town and Country Pottery Barn store were the Store General Manager and the Assistant Manager, Robertson.

32.     The store manager bonuses were paid based on the sales volume of the Town and Country Pottery Barn store.  They were paid so long as the sales at the store that month: (a) exceeded the sales volume of the same month the prior year; and (b) exceed by 6% to 10% (varying month to month) a budgeted aspirational sales goal set by Williams-Sonoma's management.  Thus, the fact that the store manager bonuses were paid in a particular month is proof positive that the store exceeded the aspirational sales goals Williams-Sonoma had set for that store that particular month.

33.     The fact that the store manager bonuses were not paid in a particular month is not necessarily proof that the store was not successful or profitable that month.  It merely means that the store did not exceed the aspirational sales goals Williams-Sonoma had set for that store that particular month, even if the store turned a profit that month.

34.     In calendar year 2009, Robertson received the monthly store manager bonus every month of that year, except for August (August is typically a slow month for retailers like Pottery Barn).  This is indisputable proof that the Town and Country Pottery Barn store exceeded the

sales goals Williams-Sonoma had set for that store every month of 2009, except for the predictably slow month of August.  In other words, by Williams-Sonoma's own standards, the Town and Country Pottery Barn store had a great year in 2009.  Indeed, Williams-Sonoma awarded the Town and Country Pottery Barn store the recognition of being the number 4 store in its "Best in Brand" competition of all Pottery Barn stores across the country.

35.     In approximately October 2009, Fagin resigned from Pottery Barn because of medical issues (Fagin Aff., Ex. A at ¶ 3). Fagin reported to the District Manager, who officed elsewhere, and had oversight responsibilities over a number of Pottery Barn stores.  The District Manager at the time was Jeff Van Antwerp (Fagin Aff., Ex. A at ¶ 4).

36.     When he resigned due to medical reasons, Fagin recommended to Van Antwerp that Robertson replace him as the General Manager of the Town and Country store (*Id*. at ¶ 9). Fagin made that recommendation because of his very favorable evaluation and perception of Robertson (*Id*.).   Van Antwerp rejected Fagin's recommendation (*Id*.).  Instead, Van Antwerp went outside the Company and hired a substantially younger person named Brian Baldwin to be the new General Manager of the Town and Country Pottery Barn store, effective January 2010 (Baldwin Aff., Ex. B at ¶¶ 2-3).

37.     Van Antwerp had made repeated age-based remarks to Robertson on occasions that he had visited her store, such as telling her "lets see if we can teach an old dog new tricks," and asking her "how old are you, 102?"

38.     Van Antwerp went outside the Company and hired Baldwin in January 2010 despite the fact that, as explained above, even by Williams-Sonoma's own metrics, the Town and Country Store had flourished in 2009 under the management of Fagin and Robertson.

**B.    IN APRIL 2010, POTTERY BARN'S TOP EXECUTIVE, VICKI McWILLIAMS, RIGHTLY GAVE ROBERTSON ONE OF THE HIGHEST COMPLIMENTS POSSIBLE**

39.    In early April 2010, Vicki McWilliams, the Executive Vice President of Retail and Business Sales for Pottery Barn, flew to Houston from San Francisco, along with some other executives from the Company.  McWilliams was the top Williams-Sonoma executive responsible for the Pottery Barn brand.  McWilliams spent two to three hours of her day with Robertson and her team in her store.  McWilliams was impressed with Robertson.

40.    Pottery Barn managers and executives have a test they apply when deciding whether to hire an applicant:  would they like to have them as their neighbor?  While driving in a sports utility vehicle with Van Antwerp and other managers and executives while she was in Houston, McWilliams said that she would "love to have Nancy as my neighbor."   Within Williams-Sonoma's corporate culture, that is one of the highest compliments that McWilliams could have paid Robertson.

41.    Also in April 2010, Van Antwerp gave Robertson her 2009 Performance Evaluation, and Baldwin sat in on the meeting. Robertson was rated "Meets Expectations" in the categories of "Inspires and Leads," "Achieves Results," and "Fosters Open Communication," and an overall score of 3.17, which was again between "Meets Expectations" and "Exceeds Expectations."  This was to be the last annual performance review that Robertson would receive before she was fired.

42.    At approximately the same time she was given her Performance Evaluation, Robertson received a merit raise of approximately .57 cents per hour (an annualized raise of $1,185.60).   That may not sound like much to some people, but .57 cents was a good merit raise for Robertson.  Baldwin even told Robertson that she must have done a really good job over the last year, because that was a really good merit raise.   In the prior two years, FLSA-exempt

-11-

managers at Pottery Barn did not receive raises because of the down economy.   Because of the raise, Robertson's annualized base salary rose to approximately $41,200.16.

43.     In 2010, Williams-Sonoma paid its Chief Executive Officer total compensation in excess of $36 million.

**C.     IN OCTOBER 2010, POTTERY BARN'S NEW DISTRICT MANAGER TOLD THE STORE GENERAL MANAGER THAT ROBERTSON WAS "OLD" AND "SHE WASN'T GOING TO CHANGE," AND INSTRUCTED HIM TO "CREATE A PAPER TRAIL" TO MAKE IT LOOK LIKE ROBERTSON'S TERMINATION WAS JUSTIFIED, EVEN THOUGH THE STORE WAS HAVING A GREAT YEAR**

44.     In late September or early October 2010, Van Antwerp was replaced by Natalie Spangler as the new District Manager over the Town and Country Pottery Barn store (Baldwin Aff., Ex. B at ¶ 4).  Spangler was approximately 30 years old at the time (*Id*. at ¶ 4).  Robertson was 63 years old at the time.  Spangler had previously been the General Manager of the Pottery Barn Highland Village store in Houston, Texas.

45.     At the time, the Town and Country Pottery Barn store was having its best year ever (Baldwin Aff., Ex. B at ¶ 16).  It was one of the top performing Pottery Barn stores in the entire country.

46.     On October 8, 2010, Baldwin gave Robertson a mid-year Performance Appraisal with an overall rating of "Meets Expectations."  That means that Robertson's "performance fully achieves, and sometimes exceeds position expectations."   In the appraisal, Baldwin noted that Robertson "is an integral part in determining whether or not our store is successful."  At that very moment, the Town and Country Pottery Barn store was performing very successfully, and was on its way to smashing the record for total revenues received in a single fiscal year for the store.

47.     Despite that, in approximately October or November 2010, Spangler told Baldwin that Robertson was "old," that "she wasn't going to change," and that "we needed to get rid of

her."   (Baldwin Aff., Ex. B at ¶ 8).  Spangler told Baldwin that she wanted him to "create a paper trail" so as to make it falsely appear as though Robertson's termination was justified on paper (*Id.*).

48.     Spangler gave these instructions to Baldwin despite the Town and Country Pottery Barn's, and Robertson's, continuing robust performance.

49.     In calendar year 2010, Robertson received the monthly store manager bonus for the months of January, February, March, April, May, September, November, and December. This is conclusive proof that the Town and Country Pottery Barn store exceeded the sales goals Williams-Sonoma had set for that store during eight of the twelve months during 2010, including the three most critical months for the Company each year, January, November, and December. This is a remarkable achievement, especially given the overall poor economy at the time.

50.     Not receiving a monthly store manager bonus for the month of October 2010 was the result of a strategic management decision.  Specifically, Baldwin and Robertson agreed that is was best to use the month of October to hire and train new employees to prepare for the holiday season (the busiest time of the year by far is November through January).  Given this decision, they knew they would not receive a store manager bonus for the month of October 2010, because of the extra payroll they strategically took on that month.  They strategically made the decision so the store would be well positioned for success as they headed into the upcoming big shopping months of November, December, and January.

51.     In October 2010, Baldwin told Susan Mancuso, the Regional Vice President, Eastern Region (to whom district managers in that region reported), and Natalie Spangler, that they had strategically done this in the month of October 2010, and neither Mancuso nor Spangler disagreed with their strategy.  Baldwin and Robertson's strategy to take on extra payroll in

-13-

October, in order to make more money in November, December, and January, paid off: the Town and Country Store exceeded the sales goals Williams-Sonoma had set for that store those particular months – the most critical three months of the year for every retailer, including Williams-Sonoma – and both Baldwin and Robertson received their monthly store manager bonuses those three months.

52. Williams-Sonoma acted consistently with Baldwin and Robertson's strategy, as it emphasized the critical importance of those three holiday months (November through January) itself by doubling the amount of the normal store manager bonuses those months. Thus, Williams-Sonoma incentivized Baldwin and Robertson to engage in the "sacrifice October for November through January" strategy, and then rewarded them with store manager bonuses double their normal size for those same months when their strategy succeeded in generating handsome holiday season profits for the Company.

53. Robertson's commitment to outstanding customer service was in full bloom for all her coworkers and Baldwin to see throughout 2010. As a reflection of this, in one of the months in 2010, Robertson won the "Catch the Spirit" award for outstanding customer service, as voted on by all the other employees in the store, including the approximately 30 to 35 Associate-level employees, three non-exempt Coordinators, and Baldwin. Robertson received a pin for winning the "Catch the Spirit" award. Robertson had won this award for outstanding customer service previously in her employment as well.

**D. WHEN THE GENERAL MANAGER DID NOT "CREATE THE PAPER TRAIL" FAST ENOUGH, THE NEW DISTRICT MANAGER DID IT HERSELF, RESULTING IN ROBERTSON'S AGE-BASED TERMINATION ON APRIL 12, 2011, DESPITE HER STORE'S REMARKABLE SUCCESS**

54. About a month or so later after her initial conversation with Baldwin about Robertson, Spangler asked Baldwin why he had not written Robertson up yet (Baldwin Aff., Ex.

B at ¶ 10). Baldwin told her that Robertson had done nothing to deserve being written up since their conversation (*Id*.). Spangler became frustrated and upset (*Id*.). In a deviation from normal practice, Spangler then overrode Baldwin and set about to create the false paper trail she had wanted him to manufacture (*Id*. at ¶¶ 11-12). She wasted no time doing so: Spangler wrote Robertson up twice on January 26, 2011 for things she did not deserve to be written up for, put Robertson on a 60-day Performance Improvement Plan ("PIP") on February 10, 2011, and then fired Robertson the day after the PIP ended, April 12, 2011 (*Id*. at ¶¶ 11, 15). The PIP was a sham from day one, designed to reach a predetermined end: firing Robertson because of her age (*Id*. at ¶ 8).

55. Ironically, as proof Robertson was actually objectively exceeding expectations at the very time Spangler was campaigning to have her fired, Robertson received the monthly store manager bonus for January 2011 (the last month of the busy holiday shopping season), just as she had for November and December 2010.

56. Baldwin was so disgusted and disturbed by Spangler's behavior that he resigned, with his last day being in mid-February 2011 (Baldwin Aff., Ex. B at ¶ 13). Spangler replaced Baldwin as the General Manager of the Town and Country Pottery Barn Store with Lynn Terna. Not surprisingly, Terna is far younger than Robertson – Terna was only 33 years old at the time. Terna had worked as an Assistant Manager under Spangler in the Highland Village store, before Spangler was promoted to District Manager. Terna thus received a promotion. In contrast, Robertson was passed over for the store General Manager position again in favor of a far younger person.

57. Robertson sensed that the PIP was a mere formality, *i.e*, a paper trail to her predetermined termination. Both Spangler and Terna treated the PIP as if it was merely a

necessary precursor to a preordained termination.  Robertson could tell that, no matter what she did, Spangler would subjectively deem it as not good enough, and fire her.  Still, as always, Robertson kept her nose to the grindstone and worked as hard as she could, with a smile on her face, and a positive attitude (Kochanski Aff., Ex. F at ¶¶ 2-7; Loya Aff., Ex. G at ¶¶ 2-16; Taflinger Aff., Ex. J at ¶¶ 2-8).

58.     On Friday, April 8, 2011, Susan Mancuso was in the Town and Country Pottery Barn store.  Mancuso lives in Cypress, Texas, and the Town and Country store is considered her "home" store, even though she is responsible for approximately sixty-five Pottery Barn stores overall.  As mentioned, Spangler and other Potter Barn District Managers in the Eastern Region report to Mancuso.  Mancuso met with Robertson and told her that her performance was not sufficient.  Robertson asked how that could possibly be, given that the Town and Country store had just completed its most profitable and successful fiscal year in its history.  Robertson told Mancuso that she felt like her age was the reason she was being treated as she was.  Mancuso got a surprised look on her face, as if the cat was out of the bag.  After an awkward pause, Mancuso then said, "why would you say that?"  Robertson rightly replied, "because it seems like no matter what I do, it is not good enough" or words to that effect.

59.     Four days later, on Tuesday, April 12, 2011, Spangler fired Robertson as the final act in her predetermined plan to get rid of Robertson because of her age, just as she had told Baldwin (Baldwin Aff., Ex. B at ¶ 8).

60.     Robertson's subordinates mourned her termination, and at least one cried when she heard the news (Loya Aff., Ex. G at ¶¶ 9, 11).  Two of Robertson's regular customers have testified that they could not believe it either (Lomonte Aff., Ex. K at ¶ 14; Robinson Aff., Ex. M at ¶ 4).

61.     Robertson was fired very shortly before she would have normally received a Performance Review for the prior year's performance.  Robertson's two prior annual reviews that she received, covering 2008 and 2009, before Spangler became her District Manager, were both positive in their overall ratings, as was the mid-year 2010 "Meets Expectations" review that Baldwin gave her on October 8, 2010.

62.     Robertson's performance in 2010 was objectively outstanding.  This is reflected in the fact that the Town and Country store's performance in fiscal year 2010 (which runs from February to January of each year) was fantastic.  Indeed, in fiscal year 2010, the Town and Country Pottery Barn store had its best year ever (Baldwin Aff., Ex. B at ¶ 16).  The store generated gross sales of approximately $6.2 million, which reflected an approximately 13% increase from the store's gross sales in fiscal year 2009 (*Id.*).  This is especially impressive because 2009 was also a very good and profitable year for the Town and Country Pottery Barn store.

63.     Further, in fiscal year 2010 the Town and Country Pottery Barn store was ranked by Williams-Sonoma as one of the top performing Pottery Barn stores in the United States of America.  And, in calendar year 2010, Robertson received the monthly store manager bonus for the months of January, February, March, April, May, September, November, and December, which proves that by Williams-Sonoma's own metrics, Robertson's performance consistently exceeded expectations in 2010, and most especially during the critical holiday shopping season.

64.     For Williams-Sonoma to fire Robertson shortly after results like this, and then offer the pretextual personal attacks on her that it has (Letter from Kobata to Oberti of 06/07/11, Ex. D at 2-3), shines a bright light on the real reason for her termination that Spangler herself already had confessed to: illegal age discrimination (Baldwin Aff., Ex. B at ¶ 8).

-17-

65.    At the time of her termination in 2011, Robertson was being paid a base salary of approximately $41,200.16, plus the aforementioned monthly store manager bonuses. She also received various health, welfare, and pension (401k) benefits, all of which were lost when she was terminated at age 63.

66.    As mentioned, in 2011, Robertson received the monthly store manager bonus for January (the last month of the busy holiday shopping season).  After Robertson was put on her PIP in February 2011, she asked Spangler if she would still be eligible to receive the monthly store manager bonus while she was on the PIP.  Spangler did not commit one way or the other, but ultimately Robertson did not receive the monthly store manager bonuses for the months of February or March, even though the store continued to do well.  This is odd, especially because in 2010, Mancuso approved the payment of a monthly store manager bonus for Spangler when Spangler was the Highland Village Pottery Barn store General Manager even though that store missed its sales goal by approximately $20,000.00 that month.

**E.    AFTER BEING CONFRONTED WITH DIRECT EVIDENCE OF ITS DISTRICT MANAGER'S AGE DISCRIMINATION AGAINST ROBERTSON, WILLIAMS-SONOMA FALSLEY CONTENDED THAT ROBERTSON WAS CHRONICALLY ABUSIVE TOWARDS MANAGERS, SUBORDINATES, AND CUSTOMERS, AND ESSENTIALLY GOT WHAT SHE LONG DESERVED WHEN SHE WAS FIRED**

67.    Robertson did not learn about Spangler's ageist remarks and instructions to Baldwin until after she was terminated.  Once she found out about them, Robertson's lawyer contacted Baldwin, and Baldwin provided a sworn affidavit reciting the age-based, illegal instructions Spangler had given him (Baldwin Aff., Ex. B).    Robertson's lawyer then sent Baldwin's affidavit to Williams-Sonoma's General Counsel, Seth Jaffe ("Jaffe"), along with a summary-level cover letter explaining that Robertson had been illegally fired because of her age (Letter from Oberti to Jaffe of 05/16/11, Ex. C).

-18-

68.     Robertson desperately hoped Jaffe and Williams-Sonoma would do the right thing rather than reflexively deny her allegations and defend Spangler.   After all, in its Code of Conduct, Williams-Sonoma promises to comply with the law, and to act ethically.

69.     Unfortunately, Robertson's hopes were dashed.   Rather than do the right thing, Williams-Sonoma violated its own Code of Conduct again, and began a defamatory assault on Robertson.

70.     Williams-Sonoma's outside legal counsel in California sent Robertson's lawyer a letter broadly and vaguely painting a picture of Robertson as an intimidating, demeaning, and grossly unprofessional manager who finally got what she long had coming to her when she was fired (Letter from Kobata to Oberti of 06/07/11, Ex. D).   Williams-Sonoma contended that Robertson's "impertinent and inappropriate behavior toward her managers, subordinates and customers created an intolerable situation ultimately leading to her discharge." (*Id*. at 1).

71.     Williams-Sonoma also aggressively asserted to Robertson's lawyer that "it appears that the only individual who did not view Ms. Robertson's leadership style as inappropriate was your client." (*Id*. at 2).

72.     Williams-Sonoma failed to identify by name a single specific manager, subordinate, or customer who supposedly thought Robertson's leadership style was inappropriate, or that Robertson's behavior was "impertinent and inappropriate" (*Id*. at 2-3). And, Williams-Sonoma provided no evidence to back up its hyped-up attacks on Robertson that sought to portray her leadership style as essentially on par with Muammar Gaddafi's (*Id*.).

73.     Williams-Sonoma topped off its attacks on Robertson by accusing her of "not being totally forthcoming" with her lawyer, and suggesting to her lawyer that he "revisit the facts with your client in light of the foregoing." (*Id*. at 3).

-19-

74.     Williams-Sonoma tellingly failed to provide Robertson's personnel file and other basic relevant information Robertson's lawyer had specifically requested from the Company (Letter from Oberti to Jaffe of 05/16/11, Ex. C at 6).   So, on the one hand, Williams-Sonoma directed Robertson's lawyer to revisit the facts, but, on the other, it refused to provide him with basic factual materials he had asked for (*Id.*).

**F.     A LONG LIST OF WITNESSES HAVE ALREADY PROVIDED SWORN TESTIMONY THAT REFUTES THE PRETEXTUAL SLURS MADE AGAINST ROBERTSON BY WILLIAMS-SONOMA**

75.     As requested by Williams-Sonoma, Robertson's counsel did diligently revisit the facts in light of Williams-Sonoma's letter.  The truth is the most important thing.

76.     Robertson's lawyer had already spoken with Baldwin, who had confirmed that Spangler had set in place a plan to fire Robertson based on age (Baldwin Aff., Ex. B at ¶ 8). Robertson's lawyer then spoke to eight more witnesses, consisting of Robertson's former manager prior to Baldwin, five former subordinates, and two customers, to see what they had to say about Robertson.   Not a single one of them backed-up Williams-Sonoma's hyperbolic assertions that Robertson's behavior was "impertinent" or "inappropriate."   Their sworn testimony was the exact opposite.

77.     Brian Fagin, Robertson's former General Manager between January 2007 and October 2009, gave an affidavit (Fagin Aff., Ex. A).  Fagin lives in Iowa now.  Fagin spoke of Robertson in glowing terms (Fagin Aff., Ex. A).  As he testified:

> Because Nancy reported directly to me for approximately two and one-half years or more, I became very familiar with her performance, attitude, and all around work.

> Based on my evaluation of Nancy, I believe that, on a scale of 1 to 10 (10 being the best) her overall job performance, attitude, and all around work was an 8 or a 9 during the time I was her General Manager.  I say this because:

- Nancy learned things quickly.

- Nancy essentially ran the store in my absence, and did so effectively.

- Nancy was honest, had integrity, and was dedicated and devoted to the Company.

- Nancy treated customers and coworkers with respect and courtesy.

- The store associates generally seemed to like and respect Nancy.

- Nancy had some growth opportunities to develop her knowledge and skills further as a manager, which is why I would not rate her a perfect 10.  But, overall, she was very good.  In fact, I had other Assistant Managers report to me during my employment at Pottery Barn, and Nancy was the best Assistant Manager I ever had.

Because of my favorable evaluation and perception of Nancy, when I resigned from the Company in approximately October 2009, I recommended to Jeff Van Antwerp that Nancy replace me as the General Manager of the store.  Mr. Van Antwerp was not in favor of that idea.

I never witnessed Nancy try to blame others for problems that were her own personal responsibility.  To the contrary, in my experiences with her, Nancy took personal responsibility for getting her job done.

I never witnessed Nancy be rude to customers.  To the contrary, Nancy treated customers with respect and courtesy.

I never witnessed Nancy scare or intimidate anyone, including any store associate.  To the contrary, Nancy treated store associates with respect and courtesy.

I did not view Nancy's leadership style as being inappropriate.  And, no one at Pottery Barn ever told me that they believed it was inappropriate.

(Fagin Aff., Ex. A at ¶¶ 7-13).

78.     Jackie Brader worked with Robertson for at least three years (Brader Aff., Ex. E at ¶ 2).  Brader testified that Robertson "was a tremendous asset to the store, and to Pottery Barn."  (Brader Aff., Ex. E at ¶ 5).  Brader testified that Robertson always went "the extra mile."  (*Id*.).    Brader explained that Robertson "was at work a lot, and I saw her do work for Pottery

Barn, such as painting one time, that was not even part of her job.  She just did it anyway because she loved Pottery Barn and her store so much." (*Id.*).  Brader also testified that:

> I worked with customers in my job, and I witnessed how Nancy treated Pottery Barn customers.  She treated them with fairness, respect, and courtesy.  I never saw Nancy treat a customer rudely or inappropriately.
>
> I witnessed how Nancy treated her subordinates, including me.  She treated them fairly, professionally, and respectfully.   She did hold her subordinates to a high standard, but she lived by that same standard herself.  She did not ask anything of her subordinates that she was not willing to do herself.   Her leadership style was fair and appropriate.  She led by example and was a good role model.  I found her inspirational.
>
> During my years of working for Pottery Barn, I saw a lot of management changes in the store.  The one constant was Nancy.  She brought stability and calm to the store.  I was shocked to hear that Nancy had been fired.  She gave Pottery Barn her all.

(Brader Aff., Ex. E at ¶¶ 6-8).

79.     Carol Kochanski worked with Robertson from August 2010 to early 2011, almost the exact same time frame as Spangler worked as the District Manager with responsibilities over Robertson's store (Kochanski Aff., Ex. F at ¶ 2).  Kochanski testified that:

> Nancy was a good manager.  I learned a lot from Nancy, especially in the Design Studio.  Her style of leadership was like a good mentor.  She took the time to work with me and other employees to teach us things.  She was a Mother figure.  She was blunt, and did not "sugar coat" things, but she was not rude or unprofessional.  She never once ridiculed or reprimanded me.
>
> I never had any problem with Nancy, or how she treated me.  I talked with other Associates at the store about our various supervisors, and I never heard any of them complain about Nancy, or how she treated them either.  I did hear them complain about how some of the Service Coordinators treated them, but not Nancy.
>
> Nancy worked really hard.  I often saw her work long days.  It seemed to me like she cared a lot about Pottery Barn and making the store successful.
>
> I also saw Nancy interact with customers.  Nancy would bend over backwards to please a customer.  She treated them with kindness and respect.   From what I saw, she was always very professional with them.

(Kochanski Aff., Ex. F at ¶¶ 4-7).

80.     Illiana Loya worked with Robertson for more than six years – from October 2004 to the time Robertson was terminated in April 2011 (Loya Aff., Ex. G at ¶ 2).  Loya resigned in August 2011 (*Id*.).  Loya testified that:

> Nancy's management style was very hands on, up-front, and honest.  Nancy was always available to help out, or provide feedback.  Nancy was one of the main reasons I stayed with Pottery Barn as long as I did.   Nancy was not afraid to roll up her sleeves and do work.

> Nancy would never ask her Associates to do something she would not do.  Nancy was very devoted and worked extremely long hours and very hard.  It seemed like she was always at the store.  Nancy was typically very upbeat and positive.   She made things fun and motivated the employees.

> Nancy was always caring and compassionate about employees' personal lives.  After she was fired, that was lost in the workplace.  After Nancy was fired, I noticed the energy and vibe in the workplace was not as fun.  The morale of the employees was lower.  It felt like the caring for the people was missing from Pottery Barn management.  This affected me.  I felt like just an employee again.  It made me less motivated to work at Pottery Barn.

> When Pottery Barn fired Nancy, it felt like I was losing a family member.  When I learned about it, I cried.   It made me leave the Company sooner than I otherwise would have.   This is so because I just don't think I would have quit when I did if Nancy had not been fired.

> After Nancy was fired, Pottery Barn management (the new general manager of the store) called me and other employees in one-by-one to talk to us about Nancy being let go.  I told her that I was not happy with it, and that I felt the store would never be the same.  I told her Nancy meant a lot to me and a lot to the success of the store.

> I know for a fact that many other Pottery Barn employees still working for Pottery Barn felt like I did about Nancy and deeply admired and respected her.  Nancy was beloved by many of the employees because she led by example and showed such care and compassion.  Terry Weingarten, Socorro Santiago, Corinna Nordin, Annienva Stokan, [and] Erica Angelo, are all current employees who told me that they felt the same way about Nancy as I did, and were all very upset about it when they learned that Pottery Barn had fired Nancy.

> Harley (sic.) Jones is a former employee who also really liked Nancy a lot and told me so.

> Nancy was a remarkable person for a lot of reasons.  She cared so much about her employees and the Pottery Barn store.  It was a passion to her, not just a job.

> Nancy was very knowledgeable.  It seemed to me that she knew everything about every single product.  She also knew the Company inside and out.  Customers that shopped there knew that Nancy was a very experienced and knowledgeable employee, and depended on Nancy.
>
> It made absolutely no business sense at all for Pottery Barn to fire Nancy.

(Loya Aff., Ex. G at ¶¶ 6-15).

81.     Harleigh Jones worked with Robertson from 2006 to November 2010 (Jones Aff., Ex. H at ¶ 2).  Jones testified that:

> Nancy was extremely knowledgeable of Pottery Barn products, procedures, and processes.  She knew the store very well.  She knew what was in inventory in the stock room without even checking on the computer.  She also knew what was expected to come in and when it would arrive. She basically knew the store and the products inside and out.
>
> Nancy also worked very hard.  She seemed driven to work hard.  She was always at work it seemed to me.  She was very dedicated to the store's success and to Pottery Barn's success.
>
> Nancy was fair with her subordinates.  She seemed to try to be as consistent as possible.  She did not play favorites.
>
> From what I saw, with both subordinates and customers, Nancy was direct and straightforward.  She was also professional.
>
> * * *
>
> When you thought of Pottery Barn at Town and Country Mall, you thought of Nancy Robertson.  That is how dedicated to the store she was and how she had put herself into it.  And that is why I was so shocked when I found out she had been terminated by Pottery Barn.

(Jones Aff., Ex. H at ¶¶ 5-11).

82.     Megan Taflinger, a part-time employee, worked with Robertson from October 2010 to March 2011 (Taflinger Aff., Ex. J at ¶ 2).  Taflinger testified that:

> During the time I worked at Pottery Bam, I got to know Nancy Robertson as she was my immediate supervisor.   From my first interview, I had a positive impression of Nancy.  She told me that she started out as a seasonal associate then eventually worked her way up to Assistant Store Manager.  She was blunt, but always treated me professionally.

From what I observed, Nancy was always professional in how she interacted with customers.  Unlike other managers at Pottery Barn, she was very hands on with customers with the regular clients knowing her name.  She was very nice to customers and did what she could to assist them.

As a recent MBA, Nancy was very supportive in my efforts to find a permanent job in finance.  She allowed me to have a flexible schedule, while still managing the needs of the business, to go on interviews and sincerely cared about my future success although it meant eventually leaving Pottery Barn.  On the day I was offered the job at the bank, she was just as excited as I was.  She also thanked me regularly for all my hard work.  She made going to work much easier and Pottery Barn a positive place.

Nancy was very committed to Pottery Barn and to the Pottery Barn store in Town and Country being successful.  Her goal was always to make the store at Town and Country the best it could.

To me, it seemed like Nancy was almost always at work at Pottery Barn.  She worked extremely long hours, but always had a smile.  She really enjoyed being at the Barn.  I regularly worked the 6AM to 2PM shift or until IOPM and she was there most of the time.  However, I felt when the new store manager took over she was more limited in her duties.

As previously mentioned, Nancy was a very hands on manager.  She would unload the heavy boxes from trucks with the guys, work the stock room when needed, help with floor sets, paint walls, climb up tall ladders to get stuff on the top shelf or ring up customers when lines would get too long.

(Taflinger Aff., Ex. J at ¶¶ 3-8).

83.    These affidavits are all from former employees.  Robertson's lawyer would have spoken to current employees too, but Williams-Sonoma did not give him permission to talk to its current employees when it accused Robertson of "not being totally forthcoming" with her lawyer, and suggested to him that he "revisit the facts."  (Letter from Kobata to Oberti of 06/07/11, Ex. D at 3).

84.    However, there is already proof that Williams-Sonoma's current employees at the Town and Country Pottery Barn store share the same sentiments as its former employees. Specifically, as noted above, Illiana Loya testified that, "I know for a fact that many other Pottery Barn employees still working for Pottery Barn felt like I did about Nancy and deeply

admired and respected her.  Nancy was beloved by many of the employees because she led by example and showed such care and compassion.  Terry Weingarten, Socorro Santiago, Corinna Nordin, Annienva Stokan, [and] Erica Angelo, are all current employees who told me that they felt the same way about Nancy as I did, and were all very upset about it when they learned that Pottery Barn had fired Nancy." (Loya Aff., Ex. G at ¶ 11).

85.     The affidavits recited above are from Williams-Sonoma's own former managers and employees.  They worked with Robertson day in and day out for years.  Their affidavit testimony is completely inconsistent with Williams-Sonoma's current position, which seeks to portray Robertson as a chronically abusive and intimidating manager (Letter from Kobata to Oberti of 06/07/11, Ex. D at 2-3).

86.     The former managers and subordinates' affidavits are, however, consistent with all the other evidence that Robertson was actually a very good Assistant Manager, such as:

a.  The Executive Vice President of Retail and Business Sales for Pottery Barn's statement in April 2010 that she would "love to have Nancy as my neighbor" – one of the highest compliments she could have paid to Robertson;

b.  The favorable ratings Robertson's direct managers gave her for in the categories of "Inspires and Leads," "Achieves Results," and "Fosters Open Communication," on the last two annual performance reviews that were given to her in 2009 and 2010;

c.  Robertson's mid-year 2010 Performance Appraisal with an overall rating of "Meets Expectations"  which was given to her by Baldwin on October 8, 2010, which means that Robertson's "performance fully achieves, and sometimes exceeds position expectations";

d.  The Town and Country's store's great success during Robertson's tenure as the Assistant Store Manager, including in 2009 and 2010;

e.  The performance-based monthly store manager bonuses that Robertson consistently received for exceeding the Company's aspirational expectations in 2009 and 2010, including in each and every month of the all-important holiday shopping seasons both years;

f.   Specifically, during the twenty-five months between January 2009 and January 2011, Robertson received the performance-based monthly store manager bonuses for exceeding the Company's aspirational expectations twenty of those months – 80% of the time – truly outstanding results as measured by Williams-Sonoma's own performance metrics;

g.   The good merit raise Robertson received in 2010; and

h.   Robertson's receipt of the "Catch the Spirit" award for outstanding customer service as voted on by every employee in her store during one month in 2010, which is strong evidence that: (i) Robertson's customer service was very good; and (ii) her coworkers and subordinates liked, respected, and admired her.

*See supra.*

87.   The Town and Country Pottery Barn's regular customers also adored Robertson, and mourned her termination.  Like many of Robertson's former subordinates, they too are upset at Williams-Sonoma for firing Robertson.   Barbie Lomonte had regularly shopped with Robertson for years  (Lomonte Aff., Ex. K at ¶ 2).  Lomonte runs a local Italian Restaurant (*Id.* at ¶ 12).   As such, Lomonte was especially perceptive about Robertson's customer service and leadership skills and styles (*Id.*).    And, the last thing Lomonte would want to do is stir up meritless litigation against a fellow employer.  Lomonte was stunned and angered by Williams-Sonoma's unjust termination of Robertson.  Lomonte testified in relevant part that:

I have shopped at the Town and Country Pottery Barn store regularly during the many years that the store has been open.

After a divorce, I moved into an apartment years ago. Nancy helped me pick out furniture and accessories.   She was very helpful, fun to work with, and informative.

In the many years I went to Nancy for help, she always showed great care for me and gave great customer service.  Her positive attitude and helpfulness separated her from the average worker at a retail store, and made her stand out as a true star.

Nancy was also a "go to" person for me for years because she knew the merchandise so well.   Plus, it seemed like Nancy was always at work, so whenever I needed her, she was there. I could count on her.  She never let me down.

In 2008, I remarried and my husband and I bought a house. Once again, Nancy assisted me with picking out furniture and accessories.  As usual, she was great to work with, and very helpful.

Nancy's customer service was incredible.  She ran a top-notch store.  She was very attentive, kind, and friendly.  She was also very high energy.  She knew the merchandise very well.   In fact, she actually knew about Pottery Barn merchandise that was coming out before it was even out.

Nancy had a lot of energy and you could feel the excitement and positivity in the store when she was there.

About a month and a half ago I was in the store and asked for Nancy.  I was told she no longer worked there.

On October 25, 2011, I saw Nancy and her husband in my restaurant, Lomonte's Italian Restaurant, which I opened in 1986.  Nancy told me she had been fired.  I was completely shocked.  Firing Nancy makes no sense at all – she was a huge asset to Pottery Barn.

Because I have run Lomonte's Italian Restaurant for so long, I know about good customer service and how important it is to a business.  Nancy's customer service was a 10 out of 10 – the very best possible.

I also know about the importance of teamwork and leadership.  With my background, I often go into a business and develop a perception about whether the workers are clicking as a team, and whether there is good leadership there.  In the case of the Town and Country Pottery Barn store, when I went in there, as I often did, I could tell that the workers functioned as a strong team and that Nancy's leadership was both inspirational and motivational.  I could tell from how the coworkers worked with Nancy that they truly respected and admired her.  Nancy led by example with her hard work, positive attitude, and high energy level.

If Pottery Barn's lawyers are now claiming that Nancy's leadership style and customer service were inappropriate, they are 100% wrong on both counts.  Anyone who says that about Nancy does not know the first thing about her, or what they are talking about.  Or, they are just flat out lying.

Because of the fact that Pottery Barn fired Nancy, I do not intend to shop at Pottery Barn again until Pottery Barn makes this situation right. Even though I like Pottery Barn's merchandise a lot, any company that would treat such a great employee like Pottery Barn treated Nancy does not deserve my business.

(Lomonte Aff., Ex. K at ¶¶ 2-14 ).

88.     Another long-time customer of the Town and Country Pottery Barn store, and business owner, Cathy Robinson, sent Robertson an e-mail six months after her termination, stating, in relevant part:

> I miss you and Illiana at pottery barn so much! Store is not the same without you!
>
> I have moved lots of business to highland village store.
>
> * * *
>
> If your home is half as attractive as the way you maintained the store your home will sell in a very timely fashion!
>
> Please keep in touch! I would very much like to keep up with you and Illiana.  If you ever need a reference of any kind, please know I would be honored!
>
> Miss you more than you know!

(E-mail from Robinson to Robertson of 10/13/11, Ex. L).

89.     Robinson then followed up with an affidavit, stating, in relevant part, that:

> I am a designer and own my own business.  I met Nancy when I went into the Town & Country Pottery Barn store several years ago for the first time, and I was immediately hooked on that particular store.  Nancy was helpful, friendly and extremely knowledgeable about the product.  It was immediately clear that Nancy believed that genuine customer service was a priority.  I always felt that Nancy and her staff were there to meet my needs. If they didn't have a product in the store, they knew when or where it was available.  It felt like a neighborhood store, and I loved it.
>
> Nancy was always professional.  Because of her and her staff, shopping at Town & Country Pottery Barn was a pleasure, and I looked forward to going into the store.  I observed Nancy working with the staff often, and it was obvious to me the mutual respect they had for each other, and that Nancy was a great leader who was very respected by the other workers in the store.
>
> I recall that at some point earlier this year in around April I was in the store and I saw Illiana Loya, one of the employees.  I asked for Nancy.  Illiana told me Nancy had been terminated.  That made me very upset.  I could not believe it.  I told Illiana that I shopped at the Town and Country Pottery Barn specifically because of Nancy.  I also told Illiana that because of the fact that the Company terminated Nancy I was so upset that I was considering writing a letter to the Pottery Barn Corporate office to complain.  I also told her that I did not want to shop at the Town and Country Store any more after Nancy was gone because it

did not feel the same and no one was as helpful and knowledgeable as when Nancy was there.

As mentioned above, I began shopping with Nancy Robertson at [the] original location of Pottery Barn in Town and Country when the store first opened. I remained a loyal customer because of Nancy's personal concern for the customer, her knowledge of product and over all willingness to please. When the store located to it's present larger location one of the things that made it such a success was Nancy's leadership. Nancy and her staff maintained that boutique feel with friendliness and organization. I cannot imagine that the [P]ottery [B]arn corporate executives could ever find a legitimate reason to terminate her.

(Robinson Aff., Ex. M at ¶¶ 2-5 ).

90.     Recall that Williams-Sonoma claimed that Robertson's "impertinent and inappropriate behavior toward her managers, subordinates and customers created an intolerable situation ultimately leading to her discharge," and that "it appears that the only individual who did not view Ms. Robertson's leadership style as inappropriate was your client." (Letter from Kobata to Oberti of 06/07/11, Ex. D at 1-2). The affidavits from Robertson's former managers, subordinates, and customers prove that Williams-Sonoma's attacks on Robertson are false. The truth of the matter is that, just as Spangler ordered (Baldwin Aff., Ex. B at ¶ 8), Robertson was fired because of her age, 63 years old. Sadly, it is plain that Williams-Sonoma made its false and unfair attacks on Robertson in an effort to conceal Spangler's age discrimination.

91.     Do the affidavits mean that no one ever complained about Robertson during her approximately five-year tenure as the Assistant Store Manager? Of course not. But, everyone knows that "a good, strong manager will draw employee complaints." *Laxton v. Gap Inc*., 333 F.3d 572, 581 (5th Cir. 2003). And any employee who interacts with the public day in and day out for years will, no matter how service-oriented and pleasant they are, on occasion, have a customer complain. *Cf. Gerving v. Opbiz, LLC*, 324 Fed. Appx. 692, 695 (9th Cir. 2009) (reversing summary judgment that had been entered for the employer in a discrimination and

retaliation case where the customer complaints cited as reasons for the plaintiff's termination were not uncommon and were used by customers to leverage discounts on disputed fees).

92.     In the *Laxton* case, the Fifth Circuit U.S. Court of Appeals affirmed a jury verdict under Title VII for the plaintiff, an ex-store manager of The Gap.   The Gap had relied on complaints from subordinates as one of its articulated reasons for terminating the plaintiff.   In affirming the jury verdict for the plaintiff, the Fifth Circuit state, "[u]pon consideration of all of the evidence, the jury may have reasonably concluded that Jones, Carr and Dotto solicited and exaggerated complaints from Laxton's assistant managers, issued a Written Warning and a Final Written Warning, and dispatched Inglis and Licona for store visits in an effort to compile a laundry list of violations to justify a predetermined decision to terminate Laxton." *Id*. at 582.

93.     In other words, in *Laxton*, the Fifth Circuit found that a reasonable jury could have concluded that The Gap exaggerated run-of-the-mill complaints and then effectuated an unlawful discriminatory "paper trail" scheme to get rid of Laxton. *Id*.  The evidence of such an unlawful discriminatory scheme to reach a "predetermined decision to terminate [Robertson]" is even stronger in this case than it was in *Laxton*.  *See supra*.

## G.     THE TWC CORRECTLY CONCLUDED THAT WILLIAMS-SONOMA TERMINATED ROBERTSON "BASED ON HER AGE," NOT HER PERFORMANCE

94.     Robertson filed a claim for unemployment benefits with the TWC.  The TWC saw through Williams-Sonoma's pretextual attack on Robertson.   The TWC's appellate tribunal correctly found that "[t]he evidence presented by the claimant showed that the claimant was terminated based on her age and not on her performance." (TWC Finding, Ex. I at 4).

95.     Robertson has diligently sought to find comparable replacement employment. Unfortunately, she has not found such employment yet.  This is no reflection on Robertson. Older   workers   in   general   find   it   more   difficult   to   get   hired.     *See*

-31-

http://knowledge.wharton.upenn.edu/article.cfm?articleid=2577 (Interview in September 2010 with Peter Cappelli, director of Wharton's Center for Human Resources, in which he states: "If you look at the research on older workers, you see an incredible amount of discrimination against them, bigger than race, bigger than gender. Older workers struggle to get hired.").

## H.   ROBERTSON'S SATISFIED ALL CONDITIONS PRECEDENT TO FILING THIS LAWSUIT

96.    Robertson has satisfied all conditions precedent to filing this suit, and bringing all the claims set forth in this suit.

97.    Robertson filed timely charges of discrimination with the Texas Workforce Commission-Civil Rights Division, and the Equal Employment Opportunity Commission. Specifically, she filed charges of age discrimination with both entities well within 180 days of being notified of her termination from Williams-Sonoma.

98.    When Williams-Sonoma submitted its unpersuasive response to Robertson's charge of discrimination with the Texas Workforce Commission-Civil Rights Division, it did not do so under oath, as required by 40 Tex. Admin. Code § 819.43(f), and as it had been instructed to do in writing by the Commission. Williams-Sonoma's response contained inaccurate factual representations intentionally designed to falsely portray Robertson in a negative light to the Commission. For example, Williams-Sonoma claimed Robertson received discipline that, in fact, she never received.

99.    Upon her request, through counsel, so that she could promptly proceed with this suit, Robertson's counsel received a right-to-sue letter from the Texas Workforce Commission-Civil Rights Division on Friday, October 28, 2011 (Ex. N), and a right-to-sue from the Equal Employment Opportunity Commission on Thursday, November 17, 2011 (Ex. O).

100.    Robertson brings this suit within 60 days of her counsel's receipt of the right-to-sue letter from the Texas Workforce Commission-Civil Rights Division, and within 90 days of her counsel's receipt of the right-to-sue letter from the Equal Employment Opportunity Commission.

101.    Hence, Robertson's claims under the ADEA and Chapter 21 of the Texas Labor Code are timely.   She has satisfied all conditions precedent to filing this suit, and exhausted all required administrative prerequisites to this suit.

**ADEA AND TEXAS LABOR CODE CLAIMS**

**Legal Overview**

102.    The ADEA was designed to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b).  Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).   "A plaintiff can demonstrate age discrimination through an indirect or inferential [circumstantial] method of proof." *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 309 (5th Cir. 2004).

103.    Circumstantial claims are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) framework.  The plaintiff must first establish a *prima facie* case by a preponderance of the evidence; once established, the *prima facie* case raises an inference of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

104.    To establish a *prima facie* case of age discrimination, Robertson must provide evidence sufficient to create an inference that she: (1) was discharged; (2) was objectively qualified for her position; (3) fell within the protected class; and (4) was terminated from her employment because of age. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307 (1996). *See also Bienkowski v. American Airlines Co.*, 851 F.2d 1503, 1506 (5th Cir.1988) (noting that a five-year age differential "does not legally preclude the possibility of discrimination against [the plaintiff]" and going on to address the remaining *McDonnell Douglas* factors); *Cannon v. St. Paul Fire and Marine Ins. Co.*, 2005 WL 1107372 at * 4 (N.D. Tex. May 6, 2005) (finding that age difference of seven years is not insubstantial as a matter of law and the court therefore assumed that the plaintiff established a *prima facie* case of age discrimination). Demonstrating that someone significantly younger replaced a plaintiff is not the sole means by which a plaintiff may establish the fourth element of a *prima facie* case. *Williams v. Harris County Hosp. Dist.*, 54 Fed. Appx. 412, at *1, n.1 (5th Cir. 2002) (not designated for publication); *cf. Jones v. Western Geophysical Co.*, 669 F.2d 280, 284 (5th Cir. 1982) (*prima facie* case may exist since replacement by another person in same protected class as plaintiff might be pretext to disguise discrimination).   The plaintiff can otherwise show "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Id.* (citing *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

105.    If the plaintiff makes out a *prima facie* case, the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment

action.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).

106.    If the defendant meets its burden, the presumption raised by the plaintiff's *prima facie* case disappears.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, (1981).  The plaintiff is then given the opportunity to demonstrate that the defendant's articulated rationale was merely a pretext for discrimination.  *See Hicks*, 509 U.S. at 507-08, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005).  Chapter 21 of the Texas Labor Code also prohibits age discrimination, and it has the same essential requirements to make out a case.  *See McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005).

107.    Regarding the standard of causation, ultimately, under the ADEA, the burden falls to the employee to produce evidence that the employer intentionally discriminated against her because of her age, and that "but for" her age, she would not have been terminated.  *See Gross v. FBL Financial Services Inc.*, 129 S.Ct. 2343, 2352 (2009) (ADEA requires "but for" causation); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 146-48 (2000); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002); *Price*, 283 F.3d at 720.

108.    However, under Chapter 21 of the Texas Labor Code, the burden falls to the employee only to produce evidence that her age was a "motivating factor" in his termination.  *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 474 (Tex. 2001) (motivating factor is the standard of causation under the Texas Labor Code); *see also Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *12 n. 2 (5th Cir. Feb. 1, 2011) (noting difference in causation standards between ADEA claims and claims under the Texas Labor Code).  Robertson satisfies both standards.

### Analysis

109.    To qualify as direct evidence of age discrimination, a statement must be (1) age related; (2) proximate in time to the termination; (3) made by an individual with authority over the termination; and (4) related to the employment decision.  *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2003).  Here, Spangler's statements to Baldwin that Robertson was "old," that "she wasn't going to change," and that she wanted him to "create a paper trail" so as to make it falsely appear as though Robertson's termination was justified on paper, satisfies all four requirements (Baldwin Aff., Ex. B at ¶ 8).  It is also completely consistent with what Spangler herself actually did to Robertson.   Accordingly, Robertson prevails on her age discrimination case under the direct evidence model of proof.  *Id*.

110.    As set out immediately above, the direct evidence model applies here, and Robertson prevails under that model.  Alternatively, or additionally, Robertson wins under the circumstantial model too.

111.    Here, Robertson easily makes out a *prima facie* case of age discrimination.  She is 63 years old.  She was objectively qualified for job she held of Assistant Store Manager from approximately May 2006 until her termination on April 12, 2011.  She was discharged and replaced by someone substantially younger than age 63, and/or can demonstrate through Spangler's comments and other evidence that her termination was based on age.  *See Machinchick*, 398 F.3d at 353 (relying on similar evidence, including age related remarks, to find that ADEA plaintiff made out a *prima facie* case); *Rachid,* 376 F.3d at 313 (evidence that plaintiff was discharged because of his age was sufficient to make out a *prima facie* case of age discrimination, even though his replacement was only five years younger).

112.    There is ample proof of pretext, that age was a motivating factor in Robertson's termination, and that but for her age, Robertson would not have been fired.  First, the discipline

Spangler imposed leading to, and including Robertson's termination, was all fabricated as part of Spangler's confessed age-based "paper trail" strategy (Baldwin Aff., Ex. B at ¶ 8).   Baldwin himself testified that Robertson did not deserve the discipline or the PIP that Spangler gave her, as well as recounted Spangler's admission that age was motivating her to get rid of Robertson (*Id.* at ¶ 11).   The probative force of this particular evidence is intensified by the fact that that the paperwork and PIP supposedly documenting Robertson's alleged problems between January and April 2011 was only created after Spangler had already instructed Baldwin to create a paper trail so that Robertson could be fired based on her age in late 2010.  *See, e.g., Laxton*, 333 F.3d at 582 (affirming a jury verdict in a discrimination case that was premised upon the theory that the employer had manufactured a predetermined paper trail in a discriminatory plan to fire the plaintiff); *Bailiff v. Securitas Sec. Services USA, Inc*., 497 F. Supp. 2d 1236, 1244 (D. Kan. 2007) (denying summary judgment in discrimination case and observing in such a factual situation that such "evidence is more probative of pretext when the only documentation that does exist is created after the termination decision has been made and under the guise of improving plaintiff's performance.").

113.     Second, Williams-Sonoma's given reason for terminating Robertson, is demonstrably false and pretextual, as largely, if not conclusively, demonstrated by the affidavits from her former managers, subordinates, and customers that are attached to this lawsuit. Williams-Sonoma contends, with no evidence, that Robertson's "impertinent and inappropriate behavior toward her managers, subordinates and customers created an intolerable situation ultimately leading to her discharge."   (Letter from Kobata to Oberti of 06/07/11, Ex. D at 1). But the actual evidence from the managers, subordinates, and customers refutes those claims (Exs. A-M).  *See, e.g., Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.*, 865 F.2d 1461,

1466-67 (5th Cir. 1989) (finding that a coworker's testimony refuting the employer's given reason for terminating and failing to rehire the plaintiff, and offering his opinion that age discrimination occurred, supported the jury's verdict in the plaintiff's favor in an ADEA case); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000) (affirming verdict for plaintiff in an ADEA case who was a manager and relying on testimony from the plaintiff's former subordinates that, "Russell did an "excellent" job of keeping the facility in federal compliance.").

114.    The potent affidavits attached to this complaint are bolstered by substantial additional evidence that further refutes the pretextual articulated basis for Robertson's termination.  For example:

- The Executive Vice President of Retail and Business Sales for Pottery Barn, Vicki McWilliams, stated in April 2010 that she would "love to have Nancy as my neighbor" – praise that, within the Williams-Sonoma culture, is one of the highest compliments she could have paid to Robertson;

- Robertson's direct managers gave her favorable ratings in the categories of "Inspires and Leads," "Achieves Results," and "Fosters Open Communication," on the last two annual performance reviews given to her, in 2009 and 2010;

- Robertson's mid-year 2010 Performance Appraisal with an overall rating of "Meets Expectations" which was given to her by Baldwin on October 8, 2010, which means that Robertson's "performance fully achieves, and sometimes exceeds position expectations";

- The store was very successful during Robertson's tenure as the Assistant Store Manager, including in 2009 and 2010, ranking as one of the top performing Pottery Barn stores in the country;

- In fiscal year 2010, which ended just approximately two months before Robertson was fired, the Town and Country store generated gross sales of approximately $6.2 million, which reflected an approximately 13% increase from the store's gross sales in fiscal year 2009, even though 2009 was itself a highly profitable and successful year;

- Robertson consistently received performance-based monthly store manager bonuses for exceeding the Company's aspirational expectations in 2009 and 2010,

including in each of the all-important months of the holiday shopping seasons (January, November, and December) both years;

- Specifically, during the twenty-five months between January 2009 and January 2011, Robertson received the performance-based monthly store manager bonuses for exceeding the Company's aspirational expectations twenty of those months – 80% of the time – an outstanding achievement as measured by Williams-Sonoma's own performance metrics;

- The good merit raise Robertson received in 2010;

- In one month in 2010, Robertson won the "Catch the Spirit" award for outstanding customer service, as voted on by all the other employees in the store, including the approximately 30 to 35 Associate-level employees, three non-exempt Coordinators, and Baldwin;

- If Robertson's customer service was what Williams-Sonoma now says it was (horrible), her coworkers would not have voted to give her the "Catch the Spirit" award for outstanding customer service; and

- If, as Williams-Sonoma contends now, Robertson was despised by her subordinates, they would not have voted to give her the "Catch the Spirit" award.

*See supra*.

115. This evidence is more than sufficient to support a jury's verdict in Robertson's favor. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (where employee submits substantial evidence that the employer gave false reasons for an adverse employment action, a reasonable jury may generally find that the real reason was prohibited discrimination); *Carmona v. Southwest Airlines Co*., 604 F.3d 848, 861-62 (5th Cir. 2010) (affirming jury verdict under *Reeves* standard); *Smith v. Xerox Corp*., 602 F.3d 320 (5th Cir. 2010) (affirming jury verdict based on motivating factor standard); *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 615, 622-24 (5th Cir. 2009) (reversing summary judgment for employer under the *Reeves* standard); *Laxton*, 333 F.3d at 581-86 (affirming jury verdict under *Reeves* standard); *Russell v. McKinney Hosp. Venture*, 235 F.3d at 225-29 (affirming jury verdict under *Reeves* standard).

116.    Third, the "jump off the page and slap the jury in the face" pretextual nature of the termination is amplified by the fact that Robertson got written up for such ticky-tack alleged violations right after Spangler pushed Baldwin aside and took it upon herself to do the dirty deeds that caused Robertson's termination.   It is unusual for the District Manager to personally do what Spangler did, even over the General Manager's objections (Baldwin Aff., Ex. B at ¶ 12). This sort of odd departure from normal practice provides more support that age motivated the decision to terminate Robertson.   *See, e.g., Greenbaum v. Svenska Handelsbanken, NY*, 67 F. Supp. 2d 228, 251-52 (S.D.N.Y. 1999) (Sotomayor, J.) (denying employer's motion for judgment notwithstanding the verdict and relying on the fact that the employer's failure to promote the plaintiff deviated significantly from its prior practice to support finding of discrimination); *cf. Tyler v. Union Oil Company of California,* 304 F.3d 379, 396 (5th Cir. 2002) (affirming a jury verdict for the plaintiffs in a reduction in force based discrimination case and stating that an employer's conscious, unexplained departure from its usual policies and procedures when conducting terminations in such circumstances may support an inference of prohibited discrimination); *Smith v. Xerox*, 371 Fed. Appx. 514, 516-21 (5th Cir. 2010) (finding for plaintiff in retaliation case even though the plaintiff was put on a PIP before she engaged in protected activity, and allegedly was terminated for failing to satisfy the PIP).

117.    Spangler's pretextual paper trail scheme is sufficient to find Williams-Sonoma liable for liquidated damages under the ADEA, and/or punitive damages under the Texas Labor Code.   *See, e.g., Patterson v. P.H.P. Healthcare Corp*., 90 F.3d 927, 943-44 (5th Cir. 1996) (supervisor's actions in falsifying documents to establish paper trail of misconduct for § 1981 plaintiff who refused his command not to hire blacks supported district court's determination of malicious or reckless conduct justifying punitive damages).

-40-

118.    Fourth, Robertson's long tenure, and the success of the Town and Country Store during her tenure, also supports her claim.  *See Weaver v. Amoco Production Co.*, 66 F.3d 85 (5th Cir. 1995) (affirming verdict in long-time employee-plaintiff's favor in an ADEA case, and an award of liquidated damages); *Smith*, 371 Fed. Appx. at 520 (emphasizing long tenure of plaintiff in affirming jury verdict in her favor).   General Managers came and went in that store. Robertson was the constant.  The store's consistent success during her tenure – and specifically in fiscal year 2010 (which had just ended two months before Robertson was fired) was substantially attributable to her hard and good work on behalf of Williams-Sonoma.   This is more evidence of age discrimination.  *See, e.g., Laxton*, 333 F.3d at 582-83 (affirming jury verdict for former store manager where the store's revenues were strong at the time the company fired the manager).  Robertson's performance remained very good in 2010 and 2011, as it had always been.  The only thing that changed was that she got a new, ageist District Manager in the fall of 2010, who was intent on getting rid of her because of her age (Baldwin Aff., Ex. B at ¶ 8).

119.    Fifth, even under a circumstantial model, Spangler's age-based negative remarks about Robertson would still be probative of age discrimination.  *See, e.g., Machinchick*, 398 F.3d 345, 353-54 (relying on age-based remarks in reversing a summary judgment granted for the employer in an age discrimination case); *Rachid*, 376 F.3d at 315; *E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1094 (5th Cir.1994) (noting that evidence of a manager's age-related statements in an age discrimination case was relevant, and reversing summary judgment that had been granted for the employer); *Russell*, 235 F.3d at 226 (age-based remarks, even if not direct evidence of age discrimination, supported jury's verdict in plaintiff's favor in an ADEA case).

120.    Substantial additional evidence also supports Robertson's claims of age discrimination. For example, the illogical nature of firing the long-time Assistant Manager of

such a successful Pottery Barn store supports Robertson's claim.  This is especially true given that Robertson was the steady constant through the store's success.  *See, e.g.*, *Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 880 n. 6 (2d Cir. 1997) (stating that "[a]ctions taken by an employer that disadvantage the employee for no logical reason" may constitute "strong evidence of intent to discriminate.").

121.    That Williams-Sonoma's response to the Texas Workforce Commission – Civil Rights Division contained false statements designed to portray Robertson in a negative light may also be evidence that further supports a finding in Robertson's favor.  *See McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (reversing summary judgment that had been entered for the employer in a discrimination case partially because the employer's report to the EEOC "contained false statements . . . .").

122.    In addition, Spangler's selection of the far younger and less qualified 33-year-old Terna for the store General Manager position after Baldwin resigned supports Robertson's claims.  This is so because, "[e]vidence concerning a claim that is not on trial . . . does not automatically lose its relevance or probative value to a claim that remains." *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 186 (5th Cir. 1999).  For example, "discriminatory incidents outside of the filing period may be relevant background information to current discriminatory acts." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *see also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885, 52 L.Ed.2d 571 (1977) (time-barred incidents "may constitute relevant background evidence").

## Damages

123.    Prevailing claimants under the ADEA and Texas Labor Code are entitled to back-pay, front-pay (or reinstatement), compensation for out-of-pocket or actual losses associated with lost benefits, reasonable attorneys' fees, costs, and interest.

124.     Prevailing claimants under the ADEA are also entitled to liquidated damages – a doubling of the back-pay award – where a violation is determined to be willful.  "A violation of the ADEA is willful if the employer knew or showed reckless disregard for whether its conduct was prohibited by the ADEA." *Smith v. Berry Co*., 165 F.3d 390, 395 (5th Cir. 1999) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).  There is no question that Williams-Sonoma's was a willful violation – Spangler openly announced her intent to get rid of Robertson because of her age (Baldwin Aff., Ex. B at ¶ 8).  *See Palasota v. Haggar Clothing Co*., 499 F.3d 474, 481-82 (5th Cir. 2007) (evidence supported finding of a willful violation of the ADEA, thus justifying award of liquidated damages); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 391-92 (5th Cir. 2003) (same); *Tyler v. Union Oil Co*., 304 F.3d 379, 398-99, 401 (5th Cir. 2002) (same, and stating that "[w]e hold that the plain language of the statutes requires the interpretation that liquidated damages in an amount equal to the back-pay award are mandatory upon a finding of willfulness."); *Woodhouse v. Magnolia Hospital*, 92 F.3d 248, 256-57 (5th Cir. 1996) (same).

125.     The Texas Labor Code allows for recovery of compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" Tex. Lab. Code § 21.2585(d).  Robertson would be entitled to such damages under the Texas Labor Code.  As one would reasonably expect, being fired after nearly 10 years of singularly devoted employment with Williams-Sonoma based on her age has been a deeply jarring, depressing, distressing, and painful experience for Robertson, who "gave Pottery Barn her all." (Brader Aff., Ex. E at ¶ 8).  *See, e.g*., *Giles v. General Electric Co*., 245 F.3d 474, 489 (5th Cir. 2001) (awarding $150,000.00 compensatory damages award in employment discrimination case); *Jackson*, 2011 WL 2119644, at *8-9 (earlier this year

-43-

affirming $300,000.00 mental anguish award for age discrimination under the Texas Labor Code).

126.    Prevailing claimants under the Texas Labor Code are entitled to punitive damages where a violation is shown to have been made with reckless disregard or malice to the plaintiff's rights under the law – as the evidence clearly and convincingly proves was the case here. *See, e.g., Quality Dialysis, Inc. v. Adams*, NO. 13-05-086-CV, 2006 WL 1553353, at *11 (Tex. App. – Corpus Christi June 8, 2006, no pet.) (affirming jury's award of punitive damages against employer in an age discrimination case brought under the Texas Labor Code); *Ancira Enter., Inc. v. Fischer*, 178 S.W.3d 82, 92-95 (Tex.App. – Austin 2005, no pet.) (same); *cf. Patterson*, 90 F.3d at 943-44 (supervisor's actions in falsifying documents to establish paper trail of misconduct for § 1981 plaintiff who refused his command not to hire blacks supported district court's determination of malicious or reckless conduct justifying punitive damages).

127.    Williams-Sonoma has employed more than 500 employees each week from January 1, 2010 to the present.

## JURY DEMAND

128.    Robertson demands a jury trial.

## PRAYER

129.    Robertson respectfully asks that the Court issue citation for Williams-Sonoma to appear and answer, and that she be awarded a judgment against Williams-Sonoma for the following:

    a.    Actual damages including by not limited to pecuniary losses, non-pecuniary losses, back-pay, front-pay (or reinstatement), and compensatory damages (the latter under the Texas Labor Code);

    b.    Liquidated damages under the ADEA.

    c.    Punitive damages under the Texas Labor Code.

d.      Prejudgment and postjudgment interest;

e.      Court costs;

f.      Reasonable attorneys' fees; and

g.      All other relief to which Robertson is justly entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:     s/ Mark J. Oberti
        Mark J. Oberti
        State Bar No. 00789951
        S.D. Texas No. 17918
        723 Main Street, Suite 340
        Houston, Texas  77002
        (713) 401-3555 – Telephone
        (713) 401-3547 – Facsimile
        mark@osattorneys.com – Email

        ATTORNEY-IN-CHARGE FOR PLAINTIFF
        NANCY ROBERTSON

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
723 Main Street, Suite 340
Houston, Texas  77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email